Joseph K. JUPITZ

v.

**NATIONAL SHIPPING COMPANY OF SAUDI ARABIA.**

Civ. No. S 89–1571.

United States District Court,
D. Maryland.

Feb. 23, 1990.

Eugene A. Shapiro, Baltimore, Md., for plaintiff.

Geoffrey S. Tobias, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for defendant.

## MEMORANDUM

SMALKIN, District Judge.

Joseph K. Jupitz filed this civil suit against National Shipping Company of Saudi Arabia (NSCSA) alleging negligence under § 5(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 901 *et seq.* (1982). Mr. Jupitz seeks damages for an injury to his wrist which occurred while he was working cargo on defendant's vessel, M/V SAUDI TABUK.

Now pending before the Court is NSCSA's motion for summary judgment. Mr. Jupitz has responded and NSCSA has replied. No oral argument is deemed necessary. Local Rule 105.6, D.Md.

For reasons set forth herein, NSCSA's motion for summary judgment is *granted.*

### Statement of Facts

On May 28, 1987, Mr. Jupitz was employed by ITO Corporation (ITO) of Baltimore, a stevedoring operation, as a "hold worker."[1] On this day, Mr. Jupitz and his

---

1. A hold worker is that longshore worker responsible for loading, moving, and securing vessel cargo in a ship's hold, or carrying space.

gang[2] were assigned to load a shipment of steel onto the SAUDI TABUK while it was berthed out of South Locust Point in Baltimore. According to Mr. Jupitz' deposition testimony, the gang had been informed prior to boarding the ship that some bagged cargo that had been loaded at a previous destination had to be shifted in order to make room for the steel. (Jupitz Dep. at 6). Mr. Jupitz testified that as soon as he got down into the ship's hold he noticed peppercorns "all over the deck." (*Id.*) The bagged cargo which the gang had to relocate was filled with peppercorns, and, as was obvious to the gang, a number of the bags had ruptured prior to the ship's arrival in Baltimore. Mr. Jupitz did not complain about the spilled peppercorns when he saw them, nor did he or anyone else attempt to sweep the area. (*Id.* at 25). Both ITO's gang carrier, Paul Green, and the gang's foreman, Mr. Thomas, also were aware of the damaged bags and the state of the ship's deck before the longshore workers commenced their job. (*Id.*)

In order to relocate the ruptured bags, Mr. Jupitz and the rest of the gang had to pick them up and load them onto pallets so that a forklift could carry them to another spot in the same hold. The relocation took about an hour. After working for about half an hour, Mr. Jupitz slipped on the peppercorns, fell, and fractured his wrist.

### Liability under § 905(b)

Mr. Jupitz brings this action under § 5(b) of the LHWCA, which provides in pertinent part:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the em-

ployer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

As alluded to in this subsection, Mr. Jupitz' claim against NSCSA can only be based on liability for NSCSA's failure to exercise the requisite standard of care owed by a shipowner to a longshore worker.[3] The framework within which the lower courts have developed this standard of care was set forth by the Supreme Court in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), which held that:

"[a shipowner's] duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

*Id.* at 166–67, 101 S.Ct. at 1621–22 (citing *Marine Terminals v. Burnside Shipping*

---

**2.** Typically, a stevedoring operation divides its workers into twenty person "gangs." These gangs are headed by a "gang carrier."

**3.** In 1972, Congress repealed that part of the act which allowed a longshore worker to recover against the shipowner for injuries caused by a vessel's unseaworthiness. Congress intended

that the almost strict liability standard of unseaworthiness under the LHWCA be discarded in favor of the more relaxed standard of negligence. *See* H.R.Rep. No. 1441, 92d Cong., 2d Sess. (1962), *reprinted in* 1972 U.S.Code Cong. & Adm.News 4698, 4703.

*Co.*, 394 U.S. 404, 416 n. 18, 89 S.Ct. 1144, 1151 n. 18, 22 L.Ed.2d 371 (1969)).

■ With respect to dangerous conditions that exist in the cargo operations of which *both* the shipowner *and* the stevedore are aware, the shipowner is entitled to rely on the expertise of the stevedore to deal with the condition in an appropriate manner *unless* the shipowner knows or should know that the stevedore's judgment as to how to best handle the situation is "obviously improvident." *Scindia*, 451 U.S. at 175, 101 S.Ct. at 1626. *See Bonds v. Mortensen & Lange*, 717 F.2d 123, 128 (4th Cir.1983). In such a case, the shipowner has a duty to stop the stevedoring operation, to make the stevedore eliminate the hazard, or to eliminate it itself. *Scindia*, 451 U.S. at 179, 101 S.Ct. at 1628 (Brennan, J., concurring). Finally, the shipowner also may be found liable if it actively involves itself in the cargo operations and, through its negligence, the longshore worker is injured. *Id.* at 167, 101 S.Ct. at 1622.

■ Thus, a plaintiff may prove negligence by showing that the shipowner either 1) turned over the hold in an unreasonably hazardous condition, 2) failed to warn the stevedore of any hazard in the hold which it knew or should have known about and that was unknown to the stevedore or that the stevedore would not become aware of or anticipate, 3) knew or should have known that the hazard which ultimately caused the injury was one that the stevedore had negotiated in an obviously improvident manner and, nevertheless, failed to intervene, or 4) actively involved itself in the cargo operation and failed to exercise due care with respect to the safety of the plaintiff.

*Analysis*

■ Because Mr. Jupitz claims that it was the peppercorns which caused his fall[4] and that he saw them prior to commencing the job, whether or not NSCSA knew about the peppercorns and failed to warn Mr. Jupitz about them is irrelevant.[5] Moreover, Mr. Jupitz neither claims nor alleges facts which show that NSCSA knew or should have known that ITO was obviously improvident in dealing with the hazard the way it did or that NSCSA itself became actively involved in the operation.[6]

The only relevant issue, then, is whether NSCSA failed to turn over the ship's hold in such condition that "an expert and experienced stevedore [would] be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property." *Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622.

■ The Court first notes that, implicit in *Scindia* and explicit in its progeny, is the fact that stevedoring carries with it a certain amount of expected or "reasonable" hazard. *See, e.g., Helaire v. Mobile Oil Co.*, 709 F.2d 1031, 1039 n. 12 (5th Cir.1983) (*Scindia* recognized that "it might well be 'reasonable' for the [ship]owner to rely on the stevedore's judgment that the condition, though dangerous, was safe enough."); *Barrios v. Pelham Marine, Inc.*, 796 F.2d 128, 132 (5th Cir.1986) (quoting same from *Helaire*); *Turner v. Costa Line Cargo Services, Inc.*, 744 F.2d 505, 512 n. 12 (5th Cir.1984) (same).

In *Hill v. Texaco, Inc.*, 674 F.2d 447 (5th Cir.1982), the court characterized this type of hazard as that which is "limited and accepted" in the trade. *See id.* at 452. In that case, the court found that the danger posed by slippery tank conditions which

4. There is some testimony by Mr. Jupitz that there was dust on the deck which had not been swept up (Jupitz Dep. at 23), and that some of the flourescent lights in the hold were broken. (*Id.* at 35). These facts are irrelevant to the Court's decision here, however, because Mr. Jupitz does not claim that either of these conditions in any way contributed to his fall.

5. Although Mr. Jupitz claims that knowledge of the spillage on the part of NSCSA is a disputed issue, it is not a material one because it is

undisputed that the condition of the hold was known to Mr. Jupitz before he started his job. (*See* Jupitz Dep. at 6).

6. As Mr. Jupitz' memorandum explains: "No discussion is necessary as to the ship's duty after commencement of the cargo operations since the gravemen [sic] of the claim *sub judice* involves that duty that applies in turning over the ship prior to cargo operations." (Plaintiff's Answer to Defendant's Motion for Summary Judgment at 4).

had been created by the ship's crew was an acceptable level of hazard. *Id.* Similarly, in *Turner,* the court held that the slippery conditions created by oil on the deck also were acceptable under the circumstances. *Id.* at 512.

Thus, a shipowner's duty under § 905(b) is to turn over the cargo area in a *reasonably* safe condition; it is not to turn over the area completely free of all hazards.

The question then becomes: are spilled peppercorns in the ship's hold which are obvious to the stevedore the kind of hazard a stevedore may reasonably be expected to cope with safely during the course of performing its operation?

■ In deciding this question, the point of departure is the principle enunciated in *Scindia* that "the primary burden is placed on the stevedore for avoiding injuries caused by obvious hazards" and that, therefore, the shipowner is justified in relying on the stevedore in the first instance to determine whether the cargo operation can be carried out safely under the circumstances. *Id.* at 180, 101 S.Ct. at 1628 (Powell, J., concurring). *See Kakavas v. Flota Oceanica Brasileira, S.A.,* 789 F.2d 112, 118 (2d Cir.1986), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986) (shipowner's duty of care qualified by "reasonable reliance on the expertise of the stevedore" where the hazard is known to stevedore). In other words, because the stevedore is "the specialist in loading and unloading," the shipowner is entitled to rely on the stevedore's judgment in deciding whether an obvious hazard can be negotiated in a safe manner. *Scindia,* 451 U.S. at 175, 101 S.Ct. at 1626. Judge Phillips of the Fourth Circuit expanded on this principle, finding that "if the shipowner may reasonably believe, despite its own knowledge of this danger, that the stevedore will act to avoid the dangerous condition, the owner cannot be said to have been negligent." *Hodges v. Evisea Maritime Co., S.A.,* 801 F.2d 678, 687 (4th Cir.1986), *cert. denied,* 480 U.S. 933, 107 S.Ct. 1572, 94 L.Ed.2d 764 (1987).

This is not to say that the mere fact that the hazard is obvious to the stevedore before it commences its operation absolves the shipowner of *all* liability. Mr. Jupitz cites *Harris v. Flota Mercante,* 730 F.2d 296 (5th Cir.1984) and *Theriot v. Bay Drilling Corp.,* 783 F.2d 527 (5th Cir.1986) to support his contention that it would work an extreme unfairness on the longshore worker to be put in the position of having either to proceed with the job in spite of the hazard or to face disciplinary action either for refusing to work or for causing undue delay while trying to defuse the danger.

In *Harris,* the ship had improperly stowed fifty pound bags of coffee by failing either to stack and tie the sacks or to support them with pallets and dunnage. Consequently, the sacks had shifted in such a way as to create an extreme hazard to those charged with unloading them. Since there was nothing the longshore workers could do to alleviate the dangerous condition, they had to try to unload the cargo as they had found it. Mr. Harris was injured, and the shipowner was found negligent, when several of the tiers of sacks fell on him while he attempted to remove them from their precarious position. *See Harris,* 730 F.2d at 297–98.

In *Theriot,* the plaintiff was responsible for assembling certain well head equipment on a drilling barge. In order to get to the equipment, Mr. Theriot had to cross a pool of drilling mud approximately six to eight feet in diameter. While traversing the mud, he fell, and the shipowner was held responsible for his injury. *See Theriot,* 783 F.2d at 530.

■ Both of these cases rely on *Napoli v. Hellenic Lines, Ltd.,* 536 F.2d 505 (2d Cir.1976), a pre-*Scindia* case, for the proposition that a shipowner cannot defend on the theory that a hazard was "open and obvious" where the worker is put in a situation where "the only alternatives would be to leave [the] job or face trouble for delaying work." *Id.* at 509. *See Woods v. Sammisa Co., Ltd.,* 873 F.2d 842, 852 n. 13 (5th Cir.1989), *cert. denied sub nom., Sammiline Co., Ltd. v. Woods,* —— U.S. ——, 110 S.Ct. 853 (1990) (Ferguson, J., dissenting); *Teply v. Mobil Oil Corp.,*

859 F.2d 375, 378 (5th Cir.1988); *Morris v. Compagnie Maritime des Chargeurs Reunis*, 832 F.2d 67, 70 (5th Cir.1987), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988).

A careful reading of this line of cases, however, reveals that this contention is only relevant in the context of *Napoli's* prior finding that *"[w]here dangers are unreasonable*, their obviousness, standing alone, should not necessarily relieve a defendant of all responsibility for their presence." *Id.* at 508 (emphasis added). Indeed, in *all* of these cases the court found that the obvious danger was unreasonable in the first place. This oft-cited "rock and a hard place" *dicta* was simply a response to the shipowners' contention that a vessel is not liable for an unreasonably dangerous condition if the stevedore knows about it and proceeds with the work anyway.[7] Rather than allow the *Napoli dicta* to take on a life of its own, as Mr. Jupitz would like, this Court holds that the question of whether the hazard is such that, in order to negotiate it, a worker must take so long as to risk reprimand from the stevedore (or the stevedore from the shipowner) is no more than a factor in determining the unreasonableness of the hazard in the first place. To be sure, this is what the court meant in *Harris* when it found that "a longshoreman's knowledge of a shipboard hazard will not negate a shipowner's duty of care *which would otherwise exist.*" *Harris*, 730 F.2d at 300, (quoting *Stass v.*

American Commercial Lines, Inc., 720 F.2d 879, 882 (5th Cir.1983)) (emphasis added). *See Theriot*, 783 F.2d at 536 (quoting same).

■ Therefore, while Mr. Jupitz need not show that there was *no* possible alternative to working in the dangerous area, he does bear the burden to show that the circumstances made safer alternatives impossible or unduly time consuming.[8] *See Teply*, 859 F.2d at 378; *Morris*, 832 F.2d at 71, *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988). Yet, Mr. Jupitz has offered no proof that the obvious alternative of sweeping the peppercorns to the side was either impractical or so time consuming as to cause serious delay in the operation. Rather, his deposition testimony reveals that although there were brooms and shovels readily available (Jupitz Dep. at 41), no one associated with the stevedoring operation even suggested that the area be cleaned up or attempted to do so. (*Id.* at 25–26).[9] Furthermore, there is no evidence that he was pressured by time or his supervisors or the ship's crew to unload the cargo with the peppercorns on the deck. *Cf. Teply*, 859 F.2d at 378.

As was stated earlier, the shipowner is entitled to rely on an "expert and experienced stevedore," such as ITO, to act with "reasonable care" to negotiate a hazard which is known to it. ITO failed to exercise reasonable care, however, when it ne-

7. The Supreme Court cited *Napoli* in determining that assumption of risk is not a viable defense under § 905(b). *Scindia*, 451 U.S. at 176 n. 22, 101 S.Ct. at 1626 n. 22. *See Taylor v. Moram Agencies*, 739 F.2d 1384, 1392 (9th Cir. 1984) (Ferguson, J., dissenting).

8. *Cf. Scindia*, 451 U.S. at 180 n. 1, 101 S.Ct. at 1629 n. 1 (Powell, J., concurring) (majority opinion not inconsistent with Restatement (Second) § 343A "reasonable anticipation" standard which considers whether "the dangerous conditions would be too difficult for the stevedore alone to remedy" in determining the shipowner's negligence in turning over an area which is obviously dangerous).

9. Mr. Jupitz' reliance on the testimony of Captain Christopher Cunningham for the proposition that this condition was unreasonably dangerous is misplaced. Although Captain Cunningham stated that "there could be a certain

amount of hazard with peppercorns on the deck," (Cunningham Dep. at 10–11), he qualified this on cross-examination by explaining that the hazard was in fact, "routine." (*Id.* at 34).

Furthermore, Mr. Jupitz himself testified: "Well, it was known that [the peppercorns] were already out and it's been other times when we worked on stuff like that, and you know, I mean some jobs are like that, I mean some jobs are worse, and it's just that's the way it is, you know." (Jupitz Dep. at 25–26).

This is not to say, however, that proof that a worker has not been injured on previous occasions while working under similar conditions is proof that the circumstances encountered on those occasions were not unreasonably hazardous. Mr. Jupitz' statement merely tends to support Capt. Cunningham's evaluation of the "routineness" of the hazard.

**1364**

glected to exercise the reasonable alternative of sweeping aside the peppercorns before it started the relocation of the bags.[10]

Under Rule 56(c) of the Federal Rules of Civil Procedure this Court must enter summary judgment where, after adequate time for discovery, the plaintiff has failed to make a showing sufficient to establish the existence of an element essential to the case, and on which the plaintiff will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After viewing the material presented and the inferences drawn therefrom in the light most favorable to Mr. Jupitz, this Court finds that he has failed to provide any evidence that NSCSA was unreasonable under the circumstances presented here. And, as a showing of unreasonableness is crucial to his case, the Court must enter summary judgment in NSCSA's favor.

Thus, Mr. Jupitz' only recourse is to look to his employer for compensation for his injuries. *Cf. Morris,* 832 F.2d at 427. To hold otherwise would stymie Congress' intention to relieve shipowners of "automatic, faultless responsibility for conditions caused by the negligence or the defaults of the stevedore." *See Scindia,* 451 U.S. at 168, 101 S.Ct. at 1622–23.

An order will be entered separately, granting defendant's motion for summary judgment.

---

**10.** The Court's determination is informed by the same practical considerations which led the court in *Turner* to find that: "Rather than remedying the 'slippery footing' here by simply throwing sawdust on the oil, as was its primary obligation, the stevedore contended itself with calling on the ship to do what was the stevedore's duty." *Id.* at 512 n. 1.